Fithian J.
(concurring). After a re-examination of the evidence in this case, I see no reason to change the opinion formed when the case was first before us. The course of the river at the place of collision was nearly north and south. The steam propeller was bound up the river and the sloop down. At the point of collision the steamer was headed on a course northerly, or substantially the same as the course of the river. The sloop received the blow of the steamer at or near her larboard fore chains, thus showing, what is not disputed, that, at the time of contact, the sloop was heading to the westward and crosswise of the river, on a course nearly if not quite at right angles with the course of the steamer. There is a direct conflict of evidence as to how and from what causes the sloop came to be in that position at the time of the collision. The testimony of the persons in charge of the steamer is, that shortly before the collision and when the two vessels respectively “ hove in sight ” of each other, the sloop was sailing down the river, with a seven or eight knot breeze, in a position in the river considerably to the eastward or starboard side of the steamer, on a course which, if kept, would have caused the vessels to have passed each other on a starboard helm, each on the starboard side of the other. It was claimed on behalf of the steamer that under such circumstances it was the duty of the sailing vessel to have kept her course and permitted the steamer to keep out of the way in any manner she saw fit. But instead of so doing, the witnesses say, that when the sloop was in close proximity to the steamer, her pilot wrongfully and improperly, under *101 the circumstances, attempted to observe the general law of the road and river, by each vessel keeping to the right, put his helm hard to port, sheered sharp to the starboard, thus throwing the sloop directly athwart the bows of the steamer, when it was too late for the latter to take any precaution to prevent the collision. This, if true, is conceded by all parties to be negligence on the part of the master of the sloop. But, on the other hand, the navigators of the sailing vessel swore, that at the time of the collision she was wholly without wind or steerage way, and was floating helplessly with the tide, and had been so floating without wind or steerage way for some two hours or more, and for some six miles or more of distance, the tide then running down the river, or ebb, at about two miles an hour. The referee finds this to be the true state of the case, and holds the sailing vessel to be without fault or negligence in the premises, and charges the steamer with the whole damage. In this I think the referee erred, without attempting to consider the question of whether the referee’s findings were or not in accordance with the evidence. But, assuming the facts in regard to the sailing vessel to be as he finds them, I am still of opinion there was fault in the conduct of the managers of the sailing vessel. It seems to me to be not only careless and negligent, but dangerous, for the master of a vessel to set his craft adrift, with all sails set, in the nighttime, in a narrow estuary, where numerous vessels are constantly passing and repassing, and allow such craft to float with the tide for hours, helpless, upon the water, without wind or steerage way. Such a situation is directly calculated to deceive and mislead approaching vessels, especially steamers. A steam vessel in motion at even a slow speed always has with her an apparent breeze. She is navigating in the night a narrow river, where it is impossible to pass other vessels without coming into some degree of close proximity. A “ wide berth ” cannot be given. The pilot of the steamer sees ahead of Mm, M the shadows of the mght, a sailing vessel with all sails set, her sailing lights all hoisted, heading in a certain direction, and with every thing about her to indicate that she was “ under way ” and obedient to *102 her helm, that she had a course and could keep it. The steamer acts in accordance with these indications, when suddenly, and too late for a remedy, the pilot of the steamer discovers that this sailing vessel is a helpless hulk, floating with the current, and approaching him in a direction entirely different from that indicated by her appearance and points of headway. It cannot be that such conduct in the managers of sailing vessels can meet the approval of the majority of men of ordinary care and prudence, in the management of their own affairs (for that is the test of negligence). In my opinion it is the duty of the manager of a sailing vessel who finds himself thus situated in the night-time, in a narrow stream liable to be constantly crowded with passing steam-vessels, either to anchor, or, if he cannot conveniently do that, to lower some of his sails and hoist his anchor lights, or do something to indicate to approaching vessels not depending upon the wind as a propelling force, that such sailing vessel is without control and unmanageable. I am not unmindful of the rule that, as between sailing vessels and steamers, the former shall keep their course and the latter keep out of the way. But that very rule implies that the sailing vessel has a course and can keep it. Under these circumstances I cannot hold the sailing vessel free from fault in contributing to the injury, in which case it is well settled and not disputed that the plaintiff cannot recover in an action at law.
The judgment must be reversed, order of reference vacated, and new trial granted.